**UNITED STATES of America,**

v.

**Maria HSIA, Defendant.**

**No. Crim. 98–0057(PLF).**

United States District Court,
District of Columbia.

Sept. 10, 1998.

Eric L. Yaffe, U.S. Dept. of Justice, Washington, DC, for U.S.

Nancy Luque, Reed Smith Shaw & McClay, Washington, DC, for Defendant.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This case is before the Court on defendant's Motion No. 1 (to Dismiss the Indictment for Violation of Due Process), Motion No. 2 (to Dismiss Counts in the Indictment for Their Positive Repugnance to the Federal Election Campaign Act), Motion No. 3 (to Dismiss Count 1 of the Indictment for Failure to State an Offense), Motion No. 5 (to Dismiss Counts 2 through 6 for Failure to State an Offense (Causation)), Motion No. 6 (to Dismiss Counts 2 through 6 for Failure to State an Offense (False Statements)), Motion No. 7 (to Dismiss Count 4 and 5 for Failure to State an Offense (Soft Money)), Motion No. 9 (to Dismiss Indictment Because it Offends the First Amendment) and Motion No. 10 (to Dismiss Indictment Because It Selectively Prosecutes Maria Hsia). For the reasons discussed below, the Court dismisses Counts 2–6, the false statements counts, and denies all other motions.[1]

## I. BACKGROUND

Maria Hsia has been indicted on one count of conspiracy to defraud the United States by impairing and impeding the Federal Election Commission ("FEC") and the Immigration and Naturalization Service ("INS"), in violation of 18 U.S.C. § 371, and five counts of causing others to file false statements with the FEC, in violation of 18 U.S.C. §§ 1001 and 2(b). All six counts are predicated on political campaign solicitations by Ms. Hsia that allegedly involved the use of "conduit" contributors to hide the "true" or "actual" sources of the funds in violation of various provisions of the Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431, et seq.

---

1. With one exception, the Court already has dealt with the other pretrial motions that were argued on July 27 and 28, 1998. *See* Opinion of August 13, 1998. The remaining motion, Motion No. 4 (to Dismiss Indictment Because It Is Tainted) is dealt with in a separate Memorandum Opinion and Order issued today.

FECA provides a detailed and comprehensive scheme to regulate the financing of federal elections by, among other things, limiting contributions to electoral campaigns and requiring candidates to report receipts and expenditures. Of specific relevance to this case, FECA provides that "[n]o person shall make contributions" that exceed certain limits set forth in the statute, 2 U.S.C. § 441a; that "[n]o person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution," 2 U.S.C. § 441f; and that it is unlawful for "any corporation whatever . . . to make a contribution or expenditure in connection with any election at which presidential or vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices." 2 U.S.C. § 441b(a).

A "contribution" is defined by the statute, in relevant part, as "money or anything of value made by any person for the purpose of influencing any election for *Federal* office." *See* 2 U.S.C. § 431(8)(A) (emphasis added).[2] Because most of FECA's restrictions apply only to funds contributed "for the purpose of influencing any election for Federal office," many political committees have set up separate accounts for money that has been donated: money that has been contributed subject to the proscriptions of FECA ("hard money") is deposited into a "federal" account and is used to finance federal election campaigns, while all other money that is donated ("soft money") is deposited into a "non-federal" account and is used for, among other things, state and local campaigns or issue advertising.

FECA requires "political committees," including national political parties, to exert "best efforts" to identify each person who made "contribution[s]" in the aggregate annual amount of $200 or more and to report that information to the FEC. 2 U.S.C. §§ 432(i), 434. FEC regulations require na-

tional political party committees to report *any* receipt of funds over $200, regardless of whether the funds are deemed "hard" or "soft" money. 11 C.F.R. § 104.8(a), (e). The statute charges the Federal Election Commission with the administration of FECA and grants the FEC exclusive jurisdiction over civil enforcement. 2 U.S.C. § 437c. It provides for both civil and criminal enforcement, and specifies criminal penalties for certain violations, up to a maximum of one year imprisonment and/or a fine. 2 U.S.C. § 437g(d). The Department of Justice prosecutes criminal violations of the statute. 2 U.S.C. § 437g(a)(5)(C).

Count 1 of the indictment charges that Ms. Hsia, a Buddhist, conspired with the International Buddhist Progress Society ("IBPS"), a tax-exempt religious organization doing business as the Hsi Lai Temple (the "Temple"), and other unnamed co-conspirators to defraud the United States by impairing, obstructing, impeding and defeating the lawful functions and duties of the FEC and the INS in violation of 18 U.S.C. § 371.[3] The indictment alleges that Ms. Hsia solicited IBPS to make contributions and donations through "conduits" (some of whom were monks, nuns and volunteers from IBPS) and that Ms. Hsia in some instances acted as a conduit for donations or contributions. The indictment alleges that Ms. Hsia (1) impaired and impeded the FEC by concealing the fact that IBPS was the true source of the contributions, and (2) impaired and impeded the INS by submitting documents to the INS stating that IBPS was not participating in political campaigns so that the INS would permit foreign nuns and monks associated with IBPS to enter or remain in the United States when she knew that IBPS in fact was making political contributions.

Counts 2–6 charge Ms. Hsia with causing the making of false statements to the FEC in violation of 18 U.S.C. §§ 2 and 1001. These counts appear to be based on conduct similar to (if not the same as) that alleged in Count 1. The indictment alleges that Ms. Hsia

---

**2.** "Contribution" is separately and more broadly defined for purposes of 2 U.S.C. § 441b. 2 U.S.C. § 441b(b)(2). The separate definition, however, is irrelevant to this case.

**3.** IBPS has not been indicted for its alleged role in the conspiracy.

knowingly and willfully caused various political committees to submit material false statements to the FEC by concealing the identity of the true source of contributions from the committees which relayed the false information to the FEC. Each count addresses a different report submitted to the FEC by a political committee which allegedly contained false statements about the identity of actual contributors. Count 2 pertains to a July 18, 1995 report and Count 3 to an October 17, 1995 report by the Clinton–Gore '96 Committee; Count 4 relates to an April 15, 1996 report and Count 5 to a July 15, 1996 report by the Democratic National Committee; and Count 6 pertains to an October 24, 1996 report by the Patrick Kennedy Committee. Counts 2 and 3 do not identify the actual source of the contributions, but Counts 4–6 allege that IBPS was the actual contributor. Counts 2–6 all allege that Ms. Hsia solicited the contributions at issue, but only Count 6 alleges that Ms. Hsia herself wrote a contribution check for which she was reimbursed by IBPS.

## II. MOTIONS TO DISMISS INDICTMENT ON FIRST AMENDMENT GROUNDS

### A. Defendant's Motion To Dismiss Indictment For Its Positive Repugnance to the Federal Election Campaign Act

Ms. Hsia argues that the Federal Election Campaign Act, 2 U.S.C. § 431, *et seq.*, impliedly repeals the more general provisions of the Federal Criminal Code, specifically the false statements statute, 18 U.S.C. § 1001, and the conspiracy statute, 18 U.S.C. § 371. This Court already has ruled that under accepted principles of statutory construction, repeals by implication are not favored and there must be substantial evidence that Congress expressly intended to preempt a general statute with a more specific statutory scheme in order to deprive a prosecutor of discretion to determine on which of a variety of seemingly applicable statutes to base a prosecution. Under this traditional analysis, FECA does not impliedly repeal or preempt the more general criminal statutes on which the prosecutor and grand jury have proceeded. *See United States v. Trie*, Criminal No.

98–0029, 1998 WL 427550, at *9 (D.D.C. July 17, 1998). Ms. Hsia maintains, however, that because the conduct regulated by FECA is political speech subject to First Amendment protection and because Congress carefully crafted and later amended FECA in order to avoid infringing on First Amendment rights, FECA necessarily occupies the field and impliedly repealed more general criminal statutes that are not tailored to protect First Amendment rights of political speech and association.

18 U.S.C. § 371 and 18 U.S.C. § 1001 broadly proscribe criminal conduct and have been applied in a wide range of circumstances. FECA, on the other hand, specifically proscribes certain conduct in the context of federal elections and provides both civil and criminal penalties for certain violations of the Act. 2 U.S.C. § 437g(d). The government does not argue that FECA's criminal provisions are unavailable to it in prosecuting Ms. Hsia. Rather, it argues that the more general criminal provisions also are available regardless of whether FECA provides a criminal penalty for the charged conduct and that the government has the discretion to decide under which statutes to proceed, the misdemeanor provisions of FECA or the felony provisions of 18 U.S.C. § 371 and 18 U.S.C. § 1001. It relies on the established principle that "whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *United States v. Batchelder*, 442 U.S. 114, 124, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). *See also Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); *United States v. Moore*, 423 U.S. 122, 138, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975).

Ordinarily, general criminal provisions remain available to supplement a specific statutory scheme unless there is evidence either (1) that Congress expressly intended to preempt a general statute with the more specific statutory scheme, or (2) that there is what the Supreme Court has labeled "a positive repugnancy" between the provisions of the specific statutory scheme and the more general statutes such that Congress must have intended to re-

peal the more general provisions by implication. *See United States v. Borden Co.,* 308 U.S. 188, 198–99, 60 S.Ct. 182, 84 L.Ed. 181 (1939). The parties here agree that when Congress enacted FECA it did not expressly repeal the more general criminal provisions and that repeal by implication is not favored. *See United States v. Borden,* 308 U.S. at 198, 60 S.Ct. 182; *United States v. Curran,* 20 F.3d 560, 566 (3d Cir.1994); *United States v. Hopkins,* 916 F.2d 207, 218 (5th Cir.1990); *United States v. Oakar,* 924 F.Supp. 232, 244–45 (D.D.C.1996), *aff'd in part, rev'd on other grounds,* 111 F.3d 146 (D.C.Cir.1997). The question is whether the pervasive First Amendment implications of federal election regulation necessarily alter the framework of analysis.

█ The Federal Election Campaign Act of 1971, Pub.L. No. 92–225, 86 Stat. 3 ("1971 FECA"), sought to regulate campaign financing in a more comprehensive way than its predecessor campaign financing statute. *See, e.g.,* H.R.Rep. No. 92–564 at 3 (1971). The major provisions of the 1971 Act focused primarily on limiting the activities of candidates for federal office, rather than on placing limitations on contributors. The Act imposed spending limits on the amount of personal funds a candidate could use in a federal election, 1971 FECA § 203, amending 18 U.S.C. § 608, and on the amount a candidate could spend for the use of communications media. 1971 FECA § 104. The Act also set forth a variety of disclosure requirements and, as part of those requirements, it prohibited contributions in the name of another, so-called conduit contributions. 1971 FECA § 310, 2 U.S.C. § 440 (1970 ed. Supp. II 1972). A number of specific criminal provisions for violations of the Act were enacted and made a part of Title 18 of the United States Code, the general Federal Criminal Code, but Congress also provided that "[a]ny person who violates any of the provisions" of Title III, Disclo-

sure of Federal Campaign Funds, which included the prohibition against contributions in the name of another, "shall be fined not more than $1,000 or imprisoned not more than one year, or both." 1971 FECA § 311(a), 2 U.S.C. § 441 (1970 ed. Supp. II 1972).[4]

In 1974, Congress amended the Federal Election Campaign Act to impose individual contribution limits and overall candidate expenditure limits and to establish a Federal Election Commission. Pub.L. No. 93–443, 88 Stat. 1263 ("1974 FECA Am."), The Senate version of the bill made the FEC the "primary civil *and criminal enforcement agency* for violation of the provisions of the Act" and provided that the Attorney General could only prosecute violations of the Act "after the [FEC] is consulted and consents to such prosecution." S.Rep. No. 93–1237 at 93 (1974) (emphasis added). The Conference Committee deleted that provision and made clear that while "the [FEC] is given power to bring civil actions in Federal District courts to enforce the provisions of the Act ... [t]he primary jurisdiction of the [FEC] to enforce the provisions of the Act is not intended to interfere in any way with the activities of the Attorney General or Department of Justice personnel in performing their duties under the laws of the United States." H.R.Rep. No. 93–1438 at 94 (1974).

The 1974 Amendments maintained the prohibition of contributions in the name of another, but moved the prohibition to Title 18 of the United States Code. A separate criminal enforcement provision for violations of that section was passed which retained the maximum one year imprisonment penalty but increased the maximum fine to $25,000. 1974 FECA Am. § 101(f)(1), adding 18 U.S.C. § 614; 1974 FECA Am. § 101(f)(4). Both in 1971 when it passed FECA and in 1974 when it amended it, Congress was aware that regulation of elections had First Amendment implications, and the issue of First Amendment rights was discussed dur-

---

4. The bill reported out of the Committee on House Administration imposed higher penalties for "willful" violations of the disclosure provisions and also provided that any "violation of this legislation by a person who, at the time of the violation, was a candidate for Federal elective office (other than President or Vice President) will disqualify such person from becoming a candidate for Senator, Representative, Delegate, or Resident Commissioner for a period of five years." H.R.Rep. No. 92–564, at 12–13 (1971). Those penalties did not survive.

ing the crafting of FECA's provisions. *See, e.g.,* S.Rep. No. 92–229 at 122–23 (supp. views of Messrs. Prouty, Cooper and Scott) (explaining that 1971 Act did not contain limitation on individual contributions because "such a limitation probably is unconstitutional"); H.Rep. No. 92–564 at 33 (add'l. views of Mr. Frenzel) (commenting on provision of 1971 House bill that would have limited individual contributions: "the limitations of contributions by individuals may ... be unconstitutional.... The suppression of free speech and the reduced participation in political processes is not justified").

In 1976, the Supreme Court held that a number of the provisions of FECA unconstitutionally restricted the First Amendment rights to political expression and association. *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (*per curiam*). The Court first noted that the "Act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Id.* at 14, 96 S.Ct. 612. The Court concluded, however, that "although the Act's contribution and expenditure limits both implicate fundamental First Amendment interests, its expenditure ceilings impose significantly more severe restrictions on protected freedoms of political expression and association than do its limits on financial contributions." *Id.* at 23, 96 S.Ct. 612. "The expenditure limitations contained in the Act represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech, [while limitations on contributions] entail[s] only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 19–21, 96 S.Ct. 612. The Court therefore upheld the constitutionality of the contribution limitations but

struck down the expenditure limits because they "place substantial and direct restrictions on the ability of candidates, citizens and associations to engage in protected political expression...." *Id.* at 58–59, 96 S.Ct. 612.[5]

The Court next turned to the disclosure requirements of FECA. It found that compelled disclosure "can seriously infringe on privacy of association and belief guaranteed by the First Amendment" and "cannot be justified by a mere showing of some legitimate governmental interest." *Buckley v. Valeo,* 424 U.S. at 64, 96 S.Ct. 612. The constitutionality of the disclosure provisions requiring major *political committees* to report contributions was not challenged, but petitioners did challenge the constitutionality of the reporting requirements that FECA imposed on *individuals* and *minor* political parties. *Id.* at 68, 96 S.Ct. 612. FECA required any individual who made "contributions or expenditures" aggregating over $100 to entities other than political committees or candidates to file a statement with the FEC. 2 U.S.C. § 434(e) (1970 ed. Supp. V). The Court found that in order to avoid problems of constitutional vagueness, the definition of "expenditure" had to be narrowed to "reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80, 96 S.Ct. 612. As construed and narrowed, the disclosure provision "bears a sufficient relationship to a substantial governmental interest" and therefore passes constitutional muster. *Id.* The Court noted that it was especially necessary to clearly define the scope of the reporting requirement because "the violation of its terms carries criminal penalties and fear of incurring these sanctions may deter those who seek to exercise protected

**5.** One can certainly debate the wisdom of the distinctions made by the Court—whether expenditure limitations are more intrusive of First Amendment interests than contribution limitations, whether both should have been treated the same for First Amendment purposes, and, if they were so treated, whether First Amendment principles and the furtherance of free and robust political debate would be better served by no

restrictions or greater restrictions. Justice Thomas' partial dissent in *Colorado Republican Federal Campaign Comm. v. Federal Election Comm'n,* 518 U.S. 604, 631–49, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (Thomas, J., dissenting in part), provides a particularly instructive discussion of the view that there is no principled reason to distinguish between contributions and expenditures for First Amendment analysis.

First Amendment rights." *Id.* at 76–77, 96 S.Ct. 612.[6]

The Chief Justice expressed concern that because FECA was intended to operate as a holistic response to campaign financing abuses, the decision in *Buckley* to strike down discrete portions of FECA would undermine the Act as a whole. *See, e.g., Buckley v. Valeo,* 424 U.S. at 235, 96 S.Ct. 612 (Burger, C.J., concurring in part and dissenting in part) ("the Court's result does violence to the intent of Congress in this comprehensive scheme of campaign finance ... the Court fails to recognize that the whole of this Act is greater than the sum of its parts"). The Chief Justice, demonstrating a certain degree of prescience, also predicted that "the Court's holding will invite avoidance, if not evasion, of the intent of the Act, with 'independent' committees undertaking 'unauthorized' activities in order to escape the limits on contributions." *Id.* at 253, 96 S.Ct. 612 (Burger, C.J., concurring in part and dissenting in part). For similar reasons, Justice White would have upheld both the contribution and expenditure limits as constitutional: "There is nothing objectionable ... in the attempt to insulate the political expression of federal candidates from the influence inevitably exerted by the endless job of raising increasingly large sums of money. I regret that the Court has returned them all to the treadmill.... The holding is perhaps not that federal candidates have the constitutional right to purchase their election, but many will so interpret the Court's conclusion in this case." *Id.* at 265–66, 96 S.Ct. 612 (White, J., concurring in part and dissenting in part).[7]

Rather than attempting to enact a new comprehensive law in reaction to *Buckley,* Congress again amended the statute. While the 1976 Amendments primarily focused on reconstituting the Federal Election Commission and correcting the constitutional violations, the Amendments also moved the criminal enforcement provisions of the Act from Title 18 and consolidated them into one provision in Title 2. Federal Election Campaign Act Amendments of 1976, Pub.L. No. 94–283, 90 Stat. 475 (May 11, 1976) ("1976 FECA Am.") §§ 112, 201. Under the new consolidated enforcement provision, any person who "knowingly and willfully commits a violation of any provision or provisions of this Act which involves the making, receiving, or reporting of any contribution or expenditure having a value in the aggregate of $1000 or more during a calendar year shall be fined in an amount which does not exceed the greater of $25,000 or 300 percent of the amount of any contribution or expenditure involved in such violation, imprisoned for not more than 1 year, or both." 1976 FECA Am. § 201.[8] In addition, the 1976 amendments provided that where the FEC finds probable cause to believe there is such a knowing and willful violation, it may refer such apparent violation to the Attorney General, 2 U.S.C. § 437g(a)(5)(D), although such a referral is not a prerequisite to a criminal prosecution. *See infra* at 16.[9]

**6.** In the remainder of its opinion in *Buckley,* the Court held (1) that the powers given to the Federal Election Commission could be exercised only by officers of the United States appointed in conformity with Article II, § 2 of the Constitution and that the Commission as constituted therefore was unconstitutional, and (2) that the public financing scheme for presidential elections was constitutional. *Buckley v. Valeo,* 424 U.S. at 85–143, 96 S.Ct. 612.

**7.** In addition to the Chief Justice and Justice White, Justice Marshall, Justice Blackmun and now Chief Justice Rehnquist all dissented from portions of the Court's opinion. Justice Stevens, newly-appointed to the Court, did not participate. So much of our federal regulatory regimen with respect to federal elections and our practical politics having been driven by the opinion in *Buckley* for over two decades, perhaps it is now time—or past time—for both Congress and the Supreme Court to seriously reexamine it. *See,*

*e.g., Colorado Republican Federal Campaign Comm. v. Federal Election Comm'n,* 518 U.S. at 631–49 (Thomas, J., dissenting in part).

**8.** That provision, now codified at 2 U.S.C. § 437g(d)(1)(A), has remained essentially the same since 1976, except that the threshold level of aggregated contributions or expenditures necessary to trigger these criminal penalties has been increased to $2000 or more during a calendar year.

**9.** Before the 1976 amendments, 18 U.S.C. §§ 608, 610, 611, 613, 614, 615, 616 and 617 had prohibited certain kinds of conduct in connection with federal elections, including exceeding contribution and expenditure limitations and contributing in the name of another, and each section provided a different penalty scheme for violations. Section 610 (prohibiting contributions or expenditures by national banks, corpo-

Against this backdrop of legislative and judicial decisions, Ms. Hsia argues that because FECA operates in areas protected by the First Amendment and because Congress so carefully crafted a comprehensive enforcement scheme to assure that it does not violate the Constitution, FECA necessarily *pro tanto* displaces the more general conspiracy and false statements statutes. For her argument, she relies primarily, if not exclusively, on the D.C. Circuit's opinion in *Galliano v. United States Postal Service*, 836 F.2d 1362 (D.C.Cir.1988). Ms. Hsia maintains that *Galliano* establishes a different framework for analysis of implied repeal in the FECA context, where a complex regulatory statute sets forth an enforcement scheme in an area permeated by First Amendment concerns.[10]

In *Galliano*, Americans for Phil Gramm ("APG"), a political action committee that was not the authorized committee of then-Congressman Gramm, solicited money in a series of mailings. APG's first mailing failed to include a disclaimer required by FECA stating that the solicitation was not authorized by Representative Gramm or his senatorial campaign committee. Subsequent mailings, however, did contain an appropriate disclaimer. The FEC found "probable cause" to believe that the first mailing violated FECA and entered into a conciliation agreement with APG, but it did not pursue any action with respect to the later mailings. Meanwhile, the United States Postal Service took administrative enforcement action against the APG for all of its mailings, invoking a Postal Service statute prohibiting the use of any scheme or device "for obtaining money ... through the mail by means of false representations." 39 U.S.C. § 3005 (1982). A Judicial Officer of the Postal Service issued two remedial orders, one of which essentially directed the postmaster to stop each piece of mail addressed to APG, inspect it and return it to the sender if it was a

response to APG's solicitations. APG filed suit in federal court to require the Postal Service to set aside its order.

On appeal, the court of appeals held that "the Postal Service, in its enforcement of [its false statements statute], may not impose constraints upon the names or disclaimers of organizations mailing solicitations for political contributions beyond those imposed by FECA." *Galliano v. United States Postal Service*, 836 F.2d at 1367. In an opinion by now Justice Ginsburg, the court acknowledged the arguments of the Postal Service that Congress did not expressly repeal the Postal Service statute when it passed FECA and that "repeals by implication are not favored." *Id.* at 1369. Nonetheless, it concluded that to "permit the Postal Service to base findings of false representation on a political action committee's name and disclaimers that are consistent with FECA requirements would defeat the substantive objective of that Act's first-amendment-sensitive provisions." *Id.* at 1370. The court therefore held that if "FECA requirements are met, then as we comprehend that legislation, no further constraints ... may be imposed by other governmental authorities." *Id.* The Court also held that if the mailings contained false representations of a sort not covered by FECA, for instance if APG made false representations concerning its past fundraising successes, the Postal Service could apply its false statements statute to that conduct even if the mailings were done for a political purpose. *Id.* at 1371.

"The tension between the general false representation provisions of [the Postal Service false statements statute] and the specific disclosure requirements of [FECA]" at issue in *Galliano* has clear parallels to the tension between FECA and the criminal false statements and conspiracy statutes at issue here. *See Galliano v. United States Postal Service*,

rations and labor organizations), Section 611 (prohibiting contributions by government contractors) and Section 613 (prohibiting contributions by foreign nationals) all provided for felony penalties. When the penalty provisions were consolidated and moved to Title 2, the maximum penalty for *any* violation became one year in prison and/or a fine, a misdemeanor penalty.

10. While a number of courts, including this one, have found that FECA does not replace criminal remedies, none has specifically addressed these First Amendment concerns. *See United States v. Curran*, 20 F.3d at 566; *United States v. Hopkins*, 916 F.2d at 218; *United States v. Trie*, Criminal No. 98–0029, 1998 WL 427550, at *9; *United States v. Oakar*, 924 F.Supp. at 244–45.

836 F.2d at 1367. The essence of the charges against Ms. Hsia center on alleged conduit contributions which led to false statements by political committees in their disclosure reports to the FEC, and FECA contains a comprehensive enforcement scheme for the civil and misdemeanor prosecution of conduit contributions. *See* 2 U.S.C. § 437g(d). Moreover, the legislative history cited by the court in *Galliano* for the proposition that the name and disclaimer provisions at issue in that case specifically safeguard the "full enjoyment of the First Amendment rights of individuals and groups to make expenditures for political expression" arguably applies also to the disclosure provision at issue in this case. *See* H.R.Rep. No. 94–917 at 5 (1976), cited in *Galliano v. United States Postal Service,* 836 F.2d at 1370. The Court concludes, however, that *Galliano* does not control this case.

First, in *Galliano,* the court of appeals found that the FEC's authority displaced the authority of the Postal Service; in other words, the authority of one administrative agency under a specific statutory scheme preempted the authority of another administrative agency under a different statutory scheme. The court relied heavily on the fact that both FECA and its legislative history state that only the FEC, "and no other governmental authority," has jurisdiction to enforce the *civil* provisions of FECA. *Galliano v. United States Postal Service,* 836 F.2d at 1368. It therefore held that "the FEC is the exclusive *administrative* arbiter of questions concerning the name identifications and disclaimers of organizations soliciting political contributions." *Id.* at 1370 (emphasis added).

In this case, by contrast, Ms. Hsia proposes displacing the authority of the Attorney General, the chief law enforcement officer of the United States, to bring *criminal* charges under the general provisions of the Federal Criminal Code. The Attorney General, however, is in a fundamentally different position from administrative agencies such as the Postal Service. She is charged with prosecuting criminal violations of the federal election laws as well as other criminal laws, and her authority is in no way limited by the FEC. *See Galliano v. United States Postal Service,* 836 F.2d at 1368 n. 6 (Attorney General has authority to criminally prosecute FECA violations regardless of whether FEC refers investigation to her); *United States v. International Union of Operating Engineers, Local 701,* 638 F.2d 1161 (9th Cir.1979) (same). Unlike the situation presented in *Galliano,* there is no issue of another agency infringing on the FEC's authority; in this case, the authority to criminally prosecute rests exclusively with the Attorney General.

Second, the court in *Galliano* found it significant that the FEC is required to conciliate civil violations of FECA prior to instituting any formal civil enforcement action. *See* 2 U.S.C. § 437g(a)(4). If conciliation is not successful, the FEC cannot administratively impose civil penalties; instead it must institute a civil action in federal district court. *See* 437g(a)(6)(A). If the Postal Service had the authority to administratively impose sanctions for conduct that is covered by FECA, the "first-amendment-prompted arrangements Congress devised for FECA enforcement actions" would be sacrificed. *Galliano v. United States Postal Service,* 836 F.2d at 1370.

The "first-amendment prompted" conciliation provisions, however, apply only to civil enforcement actions and do not apply to criminal actions. *See* 2 U.S.C. § 437g(a)(5)(C). Because the Attorney General may directly prosecute violations of FECA regardless of whether the FEC has attempted to conciliate the violation, *see United States v. International Union of Operating Engineers, Local 701,* 638 F.2d at 1163, no procedural protection is sacrificed by allowing her to charge violations under the general provisions of the Federal Criminal Code as well as under FECA. Moreover, unlike the Postal Service in *Galliano,* the Attorney General cannot impose penalties for violations of criminal statutes without instituting a proceeding in court. Regardless of whether she chooses to criminally prosecute someone under FECA or under a more general provision of the Federal Criminal Code, she must institute an action in a court of law. Allowing the Attorney General to proceed under general provisions of the Federal

Criminal Code rather than exclusively under FECA therefore sacrifices none of the "first-amendment prompted" procedural protection of FECA.[11]

Third, the court in *Galliano* focused on the fact that the finding of the Postal Service that the statements were misleading was inconsistent with the FEC's determination that the solicitations met the disclaimer requirements of FECA. The criminal provisions at issue in this case, however, rely for their meaning on the proscriptions and the definitions of FECA itself, and the definition of "contribution" and other relevant terms will control the scope of the jury's considerations and be included as part of the jury instructions.[12] The criminal statutes invoked merely provide additional enforcement mechanisms; they do not seek to penalize conduct that is expressly permitted by FECA. If this were a case in which Ms. Hsia was being prosecuted for conduct that was permissible under FECA, *Galliano* would be more on point. In this case, however, the conduct allegedly at issue—the use of conduits to conceal corporate contributions from the FEC—is specifically proscribed by FECA; there is no inconsistency between FECA and the general criminal provisions employed by the government here.

Nor is there *any* indication in the language or legislative history of FECA to indicate that Congress intended the criminal provisions of the Act to displace any of the more general federal criminal provisions in Title 18 of the United States Code. In the 1976 Amendments, Congress created one criminal penalty provision in Title 2 for violations of FECA and relocated the various criminal penalties for FECA violations that had been in Title 18. 1976 FECA Am. § 201, 2 U.S.C. § 437(g). The legislative history concerning the new FECA criminal provision, however,

focused on the need to simplify the enforcement scheme and makes no mention of repealing the more generally applicable provisions of Title 18. H.R.Rep. No. 94–917 at 3 (1976) ("[o]n the occasion of reconstituting the Federal Election Commission the Committee concluded that it was appropriate to simplify and rationalize the present enforcement system"). The only legislative history cited by Ms. Hsia indicating that Congress may have reduced criminal enforcement power when it consolidated the criminal provisions is in the statements of those who were opposed to the legislation, not those who supported it. *See* Def's Motion No. 3 at 7. The characterizations of opponents to legislation, however, are entitled to little weight. *See United States v. International Union of Operating Engineers. Local 701*, 638 F.2d at 1168.

While the defendant's preemption argument is intriguing, it ultimately fails. Wisely or not, Chief Justice Burger's holistic approach to the statute was rejected in *Buckley,* and there is no language or legislative history anywhere in the "comprehensive scheme" that is FECA to indicate that Congress intended to repeal any of the general criminal provisions of Title 18 when it enacted or amended the statute. Finally, while there are facial similarities between the situations presented by *Galliano* and this case, the significant differences that appear upon careful analysis ultimately carry the day. The Court therefore concludes that FECA does not displace *pro tanto* the general criminal provisions of 18 U.S.C. § 371 and 18 U.S.C. §§ 1001 and 2(b).

## B. *Defendant's Motion to Dismiss Indictment Because It Offends the First Amendment (Religion)*

Ms. Hsia next asserts that the indictment infringes on the right to free exercise of

---

**11.** There are, however, other constitutional constraints on her choice of statutes which are discussed *infra* at 39–60.

**12.** The government's theory in this case clearly revolves around conduct related to "contributions," and the Court already has indicated that "the easiest way to deal with [the definition of contribution is] just to tell the jury what Congress says it means and say [that] as a matter of law contribution means what is set forth in [2

U.S.C. § 431(8)(a)]." Transcript of July 27–28, 1998 Oral Argument ("Transcript") at 124. The government has agreed that it must "show in the circumstances of the case that [the alleged contributions at issue] fall[ ] within the definition of hard money as is set forth [in FECA]. That these checks were intended ultimately to be for the purpose of going towards a federal election." Transcript at 151.

religion in violation of the First Amendment and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb. The indictment is premised on the government's allegation that Ms. Hsia orchestrated a scheme in which monks and nuns from the Hsi Lai Temple wrote checks to political committees for which they were reimbursed. According to the government, the contributions therefore were made with money that "actually" belonged to the Temple and the monks and nuns were acting as conduits for the Temple, the "true contributor."

Ms. Hsia maintains that the government's theory misperceives religious doctrine and the role and use of wealth within the Buddhist community at the Temple. According to her, the Temple does not possess "property" separate from the monks' and nuns' property; all of the property that "belongs" to the Temple "belongs" to each of the monks and nuns. Under the Temple's religious doctrine, funds are held communally but are used for individual personal expenses; a monastic who incurs personal expenses may receive a payment for the expense from a Temple account, but this personal expense is not thereby converted into a Temple or "corporate" expenditure. Ms. Hsia argues that because the entire premise of the indictment is that monks and nuns acted as "conduits" for the Temple, the indictment necessarily relies on a notion of property that fundamentally is opposed to the religious doctrines of Humanistic Buddhism espoused by members of the Temple. She therefore contends that the indictment must be dismissed because it violates the First Amendment right to free exercise of religion. Alternatively, she has requested an evidentiary hearing on the issue of Buddhist beliefs and particularly the beliefs and practices of members of the Hsi Lai Temple.

■ The government first contends that Ms. Hsia has no standing to assert a free exercise defense because any such First Amendment right that might be implicated in this case belongs to the Temple and its monastics rather than to Ms. Hsia. Ms. Hsia argues that she meets the requirements for third party standing, and the Court agrees.

■ A criminal defendant has standing to raise the constitutional rights of a third party provided that (1) the defendant has suffered an "injury-in-fact" giving her a concrete interest in the outcome of the issue; (2) the defendant has a close relationship to the third party; and (3) there is some hindrance to the third party's ability to protect its own interests. *See Campbell v. Louisiana*, 523 U.S. 392, ―― ――, 118 S.Ct. 1419, 1422–23, 140 L.Ed.2d 551 (1998); *Powers v. Ohio*, 499 U.S. 400, 410–11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). First, Ms. Hsia has suffered a cognizable injury from the alleged violation of constitutional rights in this case. If the government's theory of property truly infringes on the religious rights of the Temple and its monastics, Ms. Hsia's guilt or innocence may well turn on whether she can assert the free exercise right. Unlike a case in which a criminal defendant is trying to assert the rights of a third party to suppress illegally obtained evidence, it is not clear that the indictment in this case can stand without the government's notion of property that allegedly violates the right to free exercise. Second, Ms. Hsia has a close relationship to the Temple and its monastics. Not only is she a member of the Buddhist community, the Temple is an unindicted co-conspirator. She and the Temple therefore have "a common interest" in the religious practices of the Temple and in asserting First Amendment free exercise interests in response to the indictment, and she has "an incentive to serve as an effective advocate" on these issues. *Campbell v. Louisiana*, 523 U.S. at ――, 118 S.Ct. at 1423. Finally, although the Temple is an unindicted coconspirator, there is no affirmative process by which the Temple can challenge the government's theory of property unless and until it is indicted.

On the merits of Ms. Hsia's First Amendment argument, the government asserts that the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), alters the analysis of Ms. Hsia's claim because the Supreme Court in *Smith* held that in most circumstances, the right of free exercise is not a defense against the application of an otherwise valid and neutral law of general applicability. *Id.* at 879, 884–85, 110 S.Ct.

1595. The Court also recognized, however, that the First Amendment may bar application of such a law to a religiously motivated action in cases where the free exercise claim arises "in conjunction with other constitutional protections, such as freedom of speech and of the press." *Id.* at 881, 110 S.Ct. 1595. *See also E.E.O.C. v. Catholic University of America,* 83 F.3d 455, 467 (D.C.Cir.1996).

In this case, Ms. Hsia's free exercise claim arises in conjunction with the First Amendment protection of political expression and association, *see supra* at 39–41, and is thus one of those "hybrid situation[s]" involving both free exercise and free speech that the Court catalogued in *Smith.* *Employment Division v. Smith,* 494 U.S. at 881–82, 110 S.Ct. 1595. The Court therefore concludes that *Smith* does not prevent Ms. Hsia from asserting her free exercise claim as a defense to the application of the generally applicable laws she is charged with violating. *See Cantwell v. Connecticut,* 310 U.S. 296, 304–07, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).[13] The question is whether that defense may or must be resolved on a motion to dismiss or whether it is more properly a factual matter for resolution by the jury at trial.

■ While the government does not dispute that the Temple has the right to maintain a "community treasury" from which its monks and nuns withdraw funds, it argues that Ms. Hsia's First Amendment argument raises factual issues that must await resolution by the jury at trial. Relying on *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), Ms. Hsia counters that the indictment must be dismissed before trial because the jury cannot consider the truth or falsity of a religious belief.

The import of *Ballard* is clear: In the United States of America, there is no state religion, "the law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." *United States v. Ballard,* 322 U.S. at 86, 64 S.Ct. 882 (quoting *Watson v. Jones,* 13 Wall. 679, 728, 20 L.Ed. 666 (1871)). No particular religion may be established by law, nor may the exercise of any be prohibited. U.S. CONST., amend. I. And "[i]f one could be sent to jail because a jury in a hostile environment found [particular religious] teachings false, little indeed would be left of religious freedom." *United States v. Ballard,* 322 U.S. at 87, 64 S.Ct. 882. Accordingly, when jurors in a criminal trial are asked to decide whether they accept or reject a particular religious doctrine— what Justice Douglas called deciding upon the "truth or falsity" of a religious belief— "they enter a forbidden domain." *Id. See In re Grand Jury Matter, Gronowicz,* 764 F.2d 983, 987–88 (3d Cir.1985), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 793, 88 L.Ed.2d 770 (1986).

■ By contrast, juries routinely are asked to determine whether a person sincerely holds a religious belief and whether she acted out of or was motivated by that belief or for some other reason. *See United States v. Rasheed,* 663 F.2d 843, 847–48 (9th Cir.), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982). "The First Amendment does not protect fraudulent activity performed in the name of religion," and a properly instructed jury may consider the intent or motivation of a person who invokes religious beliefs as a justification for her actions. *Id.* Indeed, while the Supreme Court in *Ballard* found that the validity of the defendants' religious beliefs was of no concern of the jury, it upheld a jury instruction that the jury could convict if it found that the defendants did not in good faith believe their representations about spiritual healing but made those representations for the purpose of obtaining money. *United States v. Ballard,* 322 U.S. at 84, 64 S.Ct. 882. *See United States v. Seeger,* 380 U.S. 163, 184, 85 S.Ct. 850, 13 L.Ed.2d 733 ("while the 'truth' of a belief is not open to question, there remains the significant question wheth-

---

13. Ms. Hsia also argues that the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, bars the government from pursuing this indictment. RFRA was an attempt by Congress to restore the protections of the First Amendment with respect to religion that had been recognized prior to the Supreme Court's decision in *Smith.* Because the Court has found that *Smith* does not limit Ms. Hsia's right to raise a defense based on her religious beliefs, RFRA does not afford any additional protection, and Ms. Hsia's RFRA claim fails for the same reason that her First Amendment free exercise claim fails.

er it is 'truly held.' This is the threshold question of sincerity which must be resolved in every case").

In this case, Ms. Hsia has presented evidence that Buddhists from the Temple believe that personally possessing property gives rise to greed, which obstructs a person's spiritual development. Def's Motion No. 9, Exh. 5 at 32. The Temple's monks and nuns therefore are encouraged to avoid managing personal accounts and instead to deposit all personal wealth into a community treasury and to withdraw funds only as needed for personal expenses. It would be inappropriate for the jury to consider whether that belief is true or false, acceptable or unacceptable. For instance, the jury may not consider whether it in fact is true that personal wealth obstructs spiritual development or whether it is reasonable to hold such beliefs. The jury may and in fact must consider, however, Ms. Hsia's motivation and the extent to which her conduct was motivated by the asserted religious beliefs. *See United States v. Rasheed*, 663 F.2d at 848.

The government represents that it expects to prove at trial that "the reimbursement money actually belonged to the Temple and that the Temple and the defendant understood that the Temple was the true (and illegal) source of the funds," Gov't Memorandum in Opposition to Def's Pretrial Motions 1–11, 13 & 14 at 46, and that the Temple reimbursed individuals for reasons other than religious doctrine. Gov't Response to Def.'s Supplement to Motion to Dismiss at 4. It argues that the defendant's claim that all Temple monies are communal is a factual question and a matter of defense for the jury to consider at trial. Transcript at 45.[14] If the jury finds that Ms. Hsia and the Temple orchestrated the alleged scheme with the intent to defraud the United States and with the intent to cause false statements to be made to the FEC, then it may find Ms. Hsia guilty. On the other hand, if the jury finds that Ms. Hsia's conduct in this case was motivated by a good faith belief that the Temple's property belonged to the monks and nuns, then the jury cannot find her guilty, regardless of whether it thinks that her belief or the beliefs of the Buddhists are reasonable or "true." These and similar questions of fact relating to intent or motive (as opposed to truth of falsity of a religious belief) are jury questions to be decided at trial. Accordingly, there is no need for an evidentiary hearing now. Nor is Ms. Hsia entitled to dismissal of the indictment.

### III. DEFENDANT'S MOTION TO DISMISS THE INDICTMENT BECAUSE IT SELECTIVELY PROSECUTES MARIA HSIA

Ms. Hsia claims that the Campaign Finance Task Force selected her for prosecution because she is Asian, in violation of the equal protection guarantee of the Due Process Clause of the Fifth Amendment. Ms. Hsia contends that the government's impermissible motivation requires dismissal of the indictment or, at the very least, limited discovery to perfect her ability to demonstrate discriminatory intent and effect. The Court concludes that Ms. Hsia has failed to present "clear evidence" that the decision to prosecute her had a discriminatory effect and was motivated by a discriminatory purpose, and she therefore is not entitled to dismissal of the indictment. *See United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *United States v. Magana*, 127 F.3d 1, 8–9 (1st Cir.1997). While she has provided "some evidence tending to show" that the prosecutorial decision both was motivated by a discriminatory purpose and had a discriminatory effect, the government in response has provided evidence that it has not discriminated against her or acted from impermissible motives. In view of the sensitive nature of the discovery sought, the fact that the government has proffered a legitimate explanation to rebut Ms. Hsia's showing of discriminatory intent and the fact

---

14. The government also argues that defendant must establish (either on this motion or in defense at trial) "that it is an element of the religion that monastics must make political contributions, and that the Temple must reimburse monastics for such contributions." Gov't Response to Def.'s Supplement to Motion to Dismiss at 4. Quite obviously, that is *not* the issue for this Court or for the jury. The issues of fact relate to whether there is a communal pot from which personal expenses come—whether they be for food, clothing or political contributions.

that Ms. Hsia's showing of discriminatory effect is not particularly strong, the Court will exercise its discretion to deny Ms. Hsia's request for limited discovery. *See United States v. Armstrong,* 517 U.S. at 469, 116 S.Ct. 1480.

 A defendant bringing a selective prosecution claim carries a very heavy burden because there is a strong presumption that prosecutors are properly discharging their official duties. *See United States v. Armstrong,* 517 U.S. at 464, 116 S.Ct. 1480. So long as the prosecutor has "probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion." *Bordenkircher v. Hayes,* 434 U.S. at 364, 98 S.Ct. 663; *see Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (prosecutor in better position than court to assess "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan"). The reluctance of courts to look behind a prosecutor's charging decision rests in part on separation of powers principles and in part on a recognition that the public prosecutor, constrained by the ethics of the legal profession and the oath to uphold the Constitution and laws of the United States, will act properly and exercise reasoned discretion. In the case of a Justice Department prosecutor, the courts' reluctance to intervene is also based on a level of judicial confidence in the systems of checks and balances and review at various levels of the Department of Justice and its hierarchy of full-time, experienced professional prosecutors, up to and including the Attorney General. Judicial deference has been accorded to the Executive in these matters precisely because it has been earned, that is, because discretion traditionally has been exercised. It is, of course, quintessentially the responsibility of the judiciary to deal—and to deal firmly—with prosecutorial overreaching or abuse of power.

 Prosecutorial discretion is not unlimited, and its exercise is subject to constitutional constraints. *United States v. Batchelder,* 442 U.S. at 125, 99 S.Ct. 2198. A prosecutor may make legitimate choices but may not select to prosecute an individual on the basis of race, religion or other arbitrary classifications. *United States v. Armstrong,* 517 U.S. at 464, 116 S.Ct. 1480 (*citing Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)). Thus, even where "the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution." *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

 In order to prevail on a selective prosecution claim and to obtain dismissal of an indictment, a defendant must clearly establish (1) that the prosecutorial decision was motivated by a discriminatory purpose or intent, and (2) that it had a discriminatory effect. *United States v. Armstrong,* 517 U.S. at 464, 116 S.Ct. 1480. Discriminatory purpose may be established either with direct evidence of intent or with "evidence concerning the unequal application of the law, statistical disparities and other indirect evidence of intent." *Branch Ministries v. Richardson,* 970 F.Supp. 11, 17 (D.D.C.1997); *see King v. Palmer,* 778 F.2d 878, 881 (D.C.Cir. 1985). A showing of discriminatory effect requires the defendant to demonstrate that similarly situated persons of other races, religions, national origin or ethnicity have not been prosecuted. For obvious reasons, the selective prosecution standard is a "demanding one," and the defendant must present "clear evidence" of both discriminatory intent and effect to establish her claim. *See United States v. Armstrong,* 517 U.S. at 463, 465, 116 S.Ct. 1480.

 Similarly, because granting discovery with respect to a selective prosecution claim may require an examination of investigative files or secret grand jury materials, including information relating to ongoing in-

vestigations in other cases, and "will divert prosecutors' resources and may disclose the Government's prosecutorial strategy ... [there is] a correspondingly rigorous standard for discovery in aid of such a claim." *United States v. Armstrong,* 517 U.S. at 468, 116 S.Ct. 1480. Absent a direct admission of discriminatory intent or purpose, a defendant seeking to obtain discovery must provide "some evidence tending to show the existence" of each of the two essential elements of her selective prosecution claim: (1) that her prosecution was improperly motivated, and (2) that she was singled out for prosecution from among others similarly situated. *See United States v. Armstrong,* 517 U.S. at 469, 116 S.Ct. 1480; *United States v. Al Jibori,* 90 F.3d 22, 25 (2d Cir.1996); *Branch Ministries v. Richardson,* 970 F.Supp. at 16. To make out such a "colorable claim" sufficient to warrant discovery, the defendant must provide something more than mere speculation or "personal conclusions based on anecdotal evidence," but the standard necessarily is lower than the "clear evidence" standard required for dismissal of the indictment. *See United States v. Armstrong,* 517 U.S. at 470, 116 S.Ct. 1480.

■ Until 1996, the Public Integrity Section of the Criminal Division of the Department of Justice had primary responsibility for investigating and prosecuting criminal violations of FECA and campaign finance violations generally. In November 1996, however, the Attorney General created the Campaign Financing Task Force to investigate and prosecute campaign finance abuses stemming from the 1996 election cycle. Since its creation, the Task Force has initiated prosecutions against eleven individuals, including Ms. Hsia. Of those eleven individuals, nine are Asian or Asian American.[15] Ms. Hsia claims that the Task Force has impermissibly selected her for prosecution on the basis of her Asian ancestry.[16]

The government does not dispute that *nine* out of a total of *eleven* or *82%* of the individuals that the Task Force has prosecuted are Asian or Asian–American. Moreover, the two non-Asians have been charged only with misdemeanors, while eight of the nine Asians and Asian Americans face or have faced felony charges. Because the Task Force to this point has returned only eleven indictments, the sample available to Ms. Hsia is quite small. Nevertheless, the statistical disparity could, if left unexplained, suggest a discriminatory purpose or motive.

In an attempt to explain why nine of the eleven cases brought by the Task Force have involved Asians or Asian Americans, the government stated at oral argument:

Well, Your Honor, I think that everyone knows the reason why this whole Task Force developed in part because of the allegations that arose in October of 1996 concerning John Huang's activities and the

---

15. The nine Asians or Asian Americans are: Maria Hsia, Charlie Trie, Antonio Pan, Johnny Chung, Pauline Kanchanalak, Duangnet "Georgie" Kronenberg, Nora Lum, Gene Lum and Trisha Lum. The two individuals who are not of Asian descent are Michael Brown (an African American) and Howard Glicken (a Caucasian American). Mr. Brown, Mr. Glicken, and Ms. Trisha Lum have pleaded guilty to misdemeanor violations of FECA. Mr. Gene Lum and Ms. Nora Lum have each pleaded guilty to a felony, conspiracy under 18 U.S.C. § 371. Mr. Chung has pleaded guilty to a variety of felony charges. The remaining five defendants have been indicted for multiple felonies and the cases are pending. Ms. Hsia has been indicted on six felony counts.

16. Ms. Hsia contends that the Campaign Financing Task Force, rather than the Department of Justice as a whole, is the relevant prosecutorial entity for selective prosecution analysis, and the government agrees. Gov't Memorandum in Opposition to Def's Motions at 73. *See McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *United States v. Gomez–Lopez,* 62 F.3d 304, 306 (9th Cir.1995).

The government has represented that the primary focus of the Task Force is "on allegations of wrongdoing in connection with the 1996 federal election cycle," Gov't Supplemental Response on Selective Prosecution Issue at 1, and the Court therefore will use that as the defining scope of the Task Force's prosecutorial authority for purposes of determining whether there are similarly situated persons that the Task Force could have prosecuted but chose not to prosecute. To the extent, however, that the Task Force also has made decisions to prosecute people such as Mr. Glicken, Mr. Brown and the Lums for violations outside of the 1996 federal election cycle, information about those prosecutions is relevant to the selective prosecution analysis because prosecutorial judgments made by the same decisionmakers are relevant to a consideration of their purpose or intent in this case.

activities on the West Coast and the allegations that surfaced.

As a matter of fact, one of the first, if not the first allegation involved the Hsi Lai Temple and the potential illegal contributions that flowed from various events at the Temple.

So, Your Honor, initially the government was pointed in that direction by the press and by things that came out concerning the community out in the Los Angeles area, specifically John Huang, and among the first people who it was alleged had engaged in potentially illegal conduct were Charlie Trie, Maria Hsia, Pauline Kanchanalak, the other people who were indicted.

... [A]nd the Government received some of its information from those sources ... through the press and others.

Transcript at 59–61. The government also acknowledged that some of the press reports on which it relied related to testimony and statements made at congressional hearings. *Id.* at 61. The government maintains, however, that its charging decisions have not been influenced by the press or by Congress.

At the time of argument on this motion, it appeared from the public record that the only connections between Mr. Huang, Mr. Trie, Ms. Hsia and Ms. Kanchanalak were (1) that they are Asian or Asian American, and (2) that three of them were indicted by the Task Force grand jury. There was no suggestion that the four people mentioned acted in concert or that the violations they allegedly committed were connected or that Mr. Trie, Ms. Hsia and Ms. Kanchanalak were connected to "the West Coast" and to John Huang. If the only commonality between them was their Asian ancestry, the government's general statements at argument would be insufficient to explain away the statistics and might leave a colorable basis for Ms. Hsia's claim that the prosecutors' decision to prosecute her for felonies was

motivated by discriminatory intent or motive. *See United States v. Al Jibori,* 90 F.3d at 26.

Since the argument, however, the government has provided a bill of particulars indicating that there was indeed a connection between Ms. Hsia, her California-based co-conspirators and Mr. Huang and that they did act in concert. It has indicated that it intends to prove at trial that Ms. Hsia met John Huang at the Hsi Lai Temple and that one of the monastics provided checks either to the defendant or to Mr. Huang. *See* Bill of Particulars at 6, 18–19. Furthermore, recent press accounts indicate that a central feature of the case against Pauline Kanchanalak and her co-defendant, Duangnet "Georgie" Kronenberg, was a Democratic-sponsored coffee with the President that John Huang orchestrated and that Ms. Kanchanalak and Ms. Kronenberg attended with Mr. Huang on June 18, 1996. *See* Robert L. Jackson and Ronald J. Ostrow, *Primary Target Charged in Probe of Clinton Donors,* L.A. Times, July 14, 1998, at A1. *See also United States v. Kanchanalak,* Criminal No. 98–0241 (D.D.C.), Indictment at ¶ 51. Thus, the government has provided evidence of more of a connection between Mr. Huang and Ms. Hsia, Ms. Kanchanalak and Ms. Kronenberg than originally appeared and has demonstrated that the Huang and West Coast connections have some factual basis. Its explanation of why at least four of the nine Asians or Asian Americans have been indicted provides a legitimate nondiscriminatory motive for the prosecutions.[17]

While the government has offered an explanation to rebut Ms. Hsia's statistical showing of discriminatory intent or motive, intent is difficult to establish without some discovery. *See Branch Ministries v. Richardson,* 970 F.Supp. at 17. Accordingly, if her evidence of discriminatory effect were stronger, Ms. Hsia probably would have a sufficient showing to warrant some discovery. Ms. Hsia's showing of discriminatory effect, however, is quite fragile.[18]

17. The government also has represented that the prosecution of Nora Lum, Gene Lum and Tricia Lum, three of the Asians prosecuted by the Task Force, "while within the purview of the Task Force, was initiated by the independent counsel investigating former Cabinet member Ronald Brown, and was brought to the Task Force by an

attorney who formerly worked for that independent counsel." Gov't Supplemental Response on Selective Prosecution Issue at 1.

18. If the Court were inclined to grant discovery, it would at the very least require disclosure of any documents in the possession of the Task

In order to establish discriminatory effect, Ms. Hsia must provide evidence that there are individuals or entities who (1) are not Asian or Asian–American, (2) committed similar offenses in connection with the 1996 federal election cycle, and (3) have not been prosecuted by the Task Force. *See Attorney General v. The Irish People, Inc.*, 684 F.2d 928, 946 (D.C.Cir.1982), *cert. denied,* 459 U.S. 1172, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). The government contends that Ms. Hsia has pointed to *no* similarly situated persons who have not been prosecuted by the Task Force, but that is not so. Ms. Hsia initially pointed to at least 13 and perhaps as many as 39 instances in which she maintains that similarly situated non-Asian individuals and entities were not prosecuted. Def's Motion to Dismiss Indictment Because It Selectively Prosecutes Maria Hsia at 4–10. While on closer analysis it appears that only two of the instances identified in her initial filing, General Cigar Company, Inc. ("GCC") and Elgin Builders, Inc., may have been similarly situated, the alleged violations in those two instances do bear similarities to the alleged violations in Ms. Hsia's case.

In both cases, the FEC investigated concealment violations committed during the 1996 federal election cycle and found reason

to believe that those persons and entities had violated the law. *See* Def's Motion 10, Exh. 4–5, 21. In both cases, the laws that the FEC found reason to believe the individuals had violated are the same laws that form the basis for the charges in Ms. Hsia's case: the prohibition against contributions in the name of another and the prohibition against corporate contributions. To date, however, none of the individuals or entities involved in those two schemes has been prosecuted by the Task Force.[19]

In a recent filing, Ms. Hsia also argues that the Task Force has made a decision not to prosecute Haley Barbour (a Caucasian American), the former Chairman of the Republican National Committee ("RNC"), with respect to foreign contributions and possibly false statements made to the FEC in RNC reports. *See* Supplement to Motion to Dismiss Indictment Because It Selectively Prosecutes Maria Hsia at 2–3. The allegations against Mr. Barbour and the allegations in the indictment against Ms. Hsia undoubtedly both involve campaign finance improprieties, but the alleged schemes in the two situations appear to be different. Ms. Hsia characterizes Mr. Barbour's offense as one in which the Republican National Committee "received foreign money in the form of a 'loan'

Force that specifically refer to Asian ancestry as a factor to be considered in investigating and prosecuting campaign finance violations or that in any way indicate that the Task Force should focus its attention on Asians or Asian Americans, including any information respecting pressure from the Congress.

**19.** In the GCC case, the General Counsel of the FEC recommended that the FEC "find reason to believe" that GCC and a number of its executives "knowingly and willfully" violated FECA's corporate contribution prohibition, 2 U.S.C. § 441b, and FECA's prohibition of contributions in the name of another, 2 U.S.C. § 441f. The respondents entered into the FEC's conciliation process and ultimately agreed to pay an $80,000 fine. Def's Motion No. 10, Exh. 4. It appears that none of the corporate officials implicated in the scheme was Asian or Asian American, and none was prosecuted by the Task Force despite the fact that the FEC found reason to believe that the company and its officials had violated the same provisions of FECA that form the basis for the charges in Ms. Hsia's case.

In the Elgin Builders case, the FEC investigated allegations that Elgin Builders funneled mon-

ey into the campaign of the Clinton/Gore Primary Committee, Inc. through its employees. *See* Def's Motion No. 10, Exh. 21. As with the scheme at issue in GCC, the FEC found reason to believe that Elgin Builders and one of its officials "knowingly and willfully" violated FECA's corporate contribution prohibition, 2 U.S.C. § 441b, and FECA's prohibition of contributions in the name of another, 2 U.S.C. § 441f. *See id.* at 9. The race and national origin of the corporate official who allegedly committed the violation is unclear from his name. He apparently has not been prosecuted.

Ms. Hsia's case allegedly involved $125,000 in conduit contributions, while GCC involved only $11,000 and Elgin Builders only $4,000—facts that arguably distinguish the cases. In GCC, however, it appears from the General Counsel's Report that there may have been additional contributions that would have increased the amount at issue. Moreover, it appears that there were aggravating circumstances in the GCC case such as the time period over which the scheme allegedly occurred and the fact that there were a number of contributions at issue that might have made this a case similar to Ms. Hsia's. Def's Motion No. 10, Exh. 5 at 3.

from a related organization." *Id.* at 2. While Ms. Hsia may be correct that "*no-one* should be held to a higher standard than an individual who heads a national political party," *id.* at 2 (emphasis in original), her characterization of Mr. Barbour's situation, even if true, raises additional complexities not present in her case. The two cases therefore are not similar.

The Court is left with only two arguably similar cases to establish discriminatory effect. If Ms. Hsia had provided stronger evidence of discriminatory intent or if the government had not proffered a legitimate explanation of the glaring statistics, the showing of discriminatory effect may have constituted a "colorable basis" sufficient to warrant discovery. *Cf. United States v. Al Jibori*, 90 F.3d at 25. Under the circumstances, however, the Court cannot conclude that Ms. Hsia has met the rigorous standard set forth in *Armstrong*. In view of the facts alleged in the bill of particulars and in the Kanchanalak/Kronenberg indictment, as well as those contained in an *ex parte, in camera* submission filed by the government and accepted for consideration by the Court, the Court concludes that discovery into the prosecutorial process is not warranted.[20]

## IV. DEFENDANT'S MOTION TO DISMISS CONSPIRACY COUNT FOR FAILURE TO STATE AN OFFENSE

█ The indictment alleges in Count 1 that Ms. Hsia "knowingly and willfully" conspired to defraud the United States, by impairing, obstructing, impeding, and defeating the lawful functions and duties of the FEC and the INS in violation of 18 U.S.C. § 371. Indictment at 4. Ms. Hsia has moved to dismiss the conspiracy count for failure to state an offense or, in the alternative, to strike the Immigration and Naturalization Service as an object of the conspiracy.

Ms. Hsia asserts that the conduct alleged in the indictment has only an attenuated connection to the FEC and virtually no connection to the INS and that the indictment does not allege that any function of the FEC or the INS was impaired by the alleged conduct. Ms. Hsia appears to be making the general argument that the offense of "conspiracy to defraud the United States" under 18 U.S.C. § 371 must be construed narrowly and that the connection between her conduct and the agencies is too attenuated to state a Section 371 offense. *See Hammerschmidt v. United States,* 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924). The Court disagrees.

The conspiracy count alleges that the FEC is an agency of the United States government "entrusted with the responsibility of enforcing the reporting requirements of the FECA . . . and responsible for making available to the public certain information about the amounts and sources of political contributions to federal candidates and their political committees," and that the INS is an agency of the United States government entrusted with the responsibility of enforcing the Immigration and Nationality Act, including a provision applying to religious workers who can obtain special visas to enter or remain in the United States "for the purpose of working for a bona fide nonprofit religious organization." Indictment at ¶¶ 6–8. The indictment next alleges that Ms. Hsia and other named and unnamed co-conspirators entered into an agreement to prevent the INS and the FEC from learning that IBPS, a corporation, had unlawfully made political contributions. Finally, the indictment alleges a series of overt acts taken by Ms. Hsia and her alleged co-conspirators to prevent the INS and the FEC from learning about the illegal contributions, including the implementation of an elaborate conduit scheme to conceal from the FEC the fact that IBPS was making political contributions and the submission of a docu-

---

**20.** Finally, it is worth noting that the facts proffered by Ms. Hsia necessarily are based on incomplete information and are premised on an assumption that none of the cases she has cited (or perhaps others) is presently being investigated by the Task Force. The cases indicted by the Task Force grand jury to date may be but the tip of a larger iceberg and the public snapshot of what ultimately may be a much wider panorama of campaign finance prosecutions. To the extent that an investigation is ongoing, the Task Force has not yet "chosen" not to prosecute those individuals or entities it is investigating, and requiring the government to disclose information about them would pose a significant threat to the government's ability later to do so. On this record, the Court declines to order discovery.

ment to the INS indicating that "IBPS had not participated in any political campaign." Indictment at ¶¶ 40(d), (e), (k), (*l*).

While Ms. Hsia is correct that in order to establish a conspiracy to defraud the United States the government must prove that the object of the conspiracy was to obstruct a specific function of a government agency, *see United States v. Haga*, 821 F.2d 1036, 1041 (5th Cir.1987), the indictment in this case clearly alleges that the object of the conspiracy was to obstruct specific functions of specific agencies. With respect to the FEC object of the conspiracy, the indictment specifically states that one of the functions of the FEC is to enforce the various provisions of FECA, including its prohibition of corporate and conduit contributions. The object of the alleged conspiracy was to prevent the FEC from learning that IBPS in fact was violating these provisions of FECA. Indictment at ¶ 11.

With respect to the INS object of the conspiracy, the indictment specifies that one of the functions of the INS is to enforce the provision of the Immigration and Nationality Act addressing the "religious worker" program. The indictment alleges that it was an object of the conspiracy to prevent the INS from learning that IBPS gave political contri-

butions, a fact which may have jeopardized IBPS' eligibility for the religious worker program. Indictment at ¶ 12. The indictment therefore specifically alleges a conspiracy to impair and impede specific functions of the FEC and the INS. The government, of course, will have the burden of proving the existence of a conspiratorial agreement and the obstruction of a function of the FEC or the INS at trial, but the indictment sufficiently alleges a Section 371 conspiracy.[21]

As for Ms. Hsia's alternative request that the Court strike the INS as an object of the conspiracy, the Court's initial concerns about whether there was any evidence of a connection between Ms. Hsia's activities and the lawful functions of the INS, *see* Opinion of August 13, 1998 at 30–31, have been allayed by the government's bill of particulars. *See* Bill of Particulars at 9–13 ("From 1993 through 1996, the defendant and IBPS concealed that the Temple was the true source of funds for contributions to local, state and federal candidates, and provided false and misleading documentation to the INS in connection with I–129 and I–360 petitions for persons to work at the Hsi Lai Temple ... Based upon the false and misleading documentation in the applications, the INS took

21. Ms. Hsia also argues that because the conduct alleged in the indictment is proscribed by FECA, the government is required to charge her with conspiracy to violate FECA, a misdemeanor, rather than with conspiracy to defraud the United States. She relies on the Sixth Circuit's opinion in *United States v. Minarik*, 875 F.2d 1186, 1194 (6th Cir.1989) (conspiracy whose objective is "covered by a specific offense defined by Congress" must be prosecuted "exclusively under the offense clause" of Section 371 rather than under the defraud clause). The Court does not find this argument persuasive.

While the language of *Minarik* was very broad, the Sixth Circuit has subsequently narrowed the holding in *Minarik* quite significantly. *See United States v. Khalife*, 106 F.3d 1300, 1304–06 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998); *United States v. Kraig*, 99 F.3d 1361, 1367–68 (6th Cir.1996); *United States v. Sturman*, 951 F.2d 1466, 1473–74 (6th Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2964, 119 L.Ed.2d 586 (1992); *United States v. Mohney*, 949 F.2d 899, 901–03 (6th Cir.1991), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992). *Minarik* also has been limited to the peculiar factual circum-

stances presented there: (1) the government's theory of conspiracy shifted throughout the case, a problem that was magnified by the fact that the indictment did not allege the specific functions of the agency that allegedly were impeded; (2) the defendants' alleged criminal conduct consisted of one limited act of concealment, a fact that made the breadth of the alleged conspiracy incommensurate with the *Minarik* court's conception of a general conspiracy to defraud; and (3) the duties at issue were highly technical. *See United States v. Khalife*, 106 F.3d at 1304–06.

The same factual scenario is not presented in this case. The indictment charging Ms. Hsia with conspiracy identifies the specific functions of the agencies that allegedly were impaired or impeded. *See supra* at 52–53. Moreover, the conduct alleged in Ms. Hsia's indictment spans over a long period of time, implicates several provisions of FECA and impaired or impeded more than one governmental agency. While the government *could* have charged Ms. Hsia with conspiracy to violate FECA, the object of the conspiracy here clearly involved much more than a conspiracy to violate FECA, and it was well within the government's discretion to choose to charge her under the defraud clause of Section 371.

no action to investigate the Temple's activities or tax status, and generally approved the applications with dispatch"). The INS therefore will not be stricken as an object of the conspiracy.

## V. MOTIONS TO DISMISS FALSE STATEMENTS COUNTS

Counts 2–6 of the indictment charge Ms. Hsia with having caused various political committees to make false statements to the FEC in violation of 18 U.S.C. §§ 1001 and 2(b). Section 1001 provides, in relevant part, that "whosoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry" shall be held criminally liable. 18 U.S.C. § 1001. Section 2(b) provides that "[w]hoever willfully *causes* an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b) (emphasis added).

All of the false statements counts allege that Ms. Hsia "knowingly and willfully caused the submission of a material false statement to the FEC" by causing a federal political committee to file a report with the FEC that listed certain individuals as "contributors" when Ms. Hsia "knew, in truth and in fact, [that] the individuals named in the report were not the actual contributors." *See, e.g.*, Indictment at ¶ 43. Each of the five counts alleges that Ms. Hsia solicited the contributions that led to the making of false statements by the political committees; Count 6 also alleges that in one case Ms. Hsia acted as one of the conduits. Indictment at ¶ 54. The indictment does not identify the "actual" contributor in Counts 2 and 3, but it alleges that the "actual" contributor

in Counts 4–6 was the Hsi Lai Temple. The government has specified that the "false statements" are the names of the "contributors" listed by the political committees in their reports to the FEC and that the political committees took the names from the signature line of the checks submitted to them. The falsity, according to the government's theory, stems from the fact that the names listed on the reports are not the names of the "actual" contributors but instead are the names of the "conduits" who signed the checks.

To recite the bare factual allegations of the indictment and the words of Sections 1001 and 2(b), however, does not capture the Alice–in–Wonderland–like maze of logical leaps and tangled inferences that are required in order to find that this indictment adequately alleges Section 1001 and 2(b) violations or to find that anyone in Ms. Hsia's position would be on notice that her alleged conduct violated these statutes. At every turn, one encounters another place where the government's theory defies logic and stretches almost beyond recognition the two criminal statutes on which it relies. Only by invoking the most highly technical and inventive reasoning does the indictment even arguably allege conduct that constitutes the essential elements of the offense: false statements, causation, and knowing and willful conduct. While inventive and clever applications of statutes may have their place in some legal settings, they have no place in an indictment charging someone with serious felonies for conduct that implicates several of the protections of the First Amendment and has such a tenuous relationship to the ultimate submission of a false statement to the FEC. The Court concludes that any finding that the conduct alleged in the indictment constitutes a false statements offense would require an impermissibly strained reading of Sections 1001 and 2(b). These counts therefore must be dismissed.[22]

 One of the fundamental problems with the indictment is that it provides no details with respect to how the conduct al-

---

22. In view of the Court's decision to dismiss Counts 2–6, it is unnecessary to address the arguments raised in Ms. Hsia's Motion No. 7, to

Dismiss Counts 4 & 5 for Failure to State an Offense (Soft Money).

leged constitutes the essential elements of the offenses charged. Each of the essential elements is included only by virtue of the fact that the indictment faithfully recites the words of the statutes: Ms. Hsia "knowingly and willfully" "caused" the submission of "false statements" to the FEC. Generally, of course, it is sufficient for an indictment to charge the criminal offense in the words of the statute itself, provided that those words "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (quoting *United States v. Carll,* 105 U.S. 611, 612, 26 L.Ed. 1135 (1881)). The bare recitation of the statutory language, however, must also be "accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which [she] is charged." *Id.* Especially where "the statutory definition of an offense employs generic terms, it is not sufficient to charge the offense in the same terms employed by the statute; the indictment must 'descend to particulars.'" *United States v. Sullivan,* 919 F.2d 1403, 1411 (10th Cir.1990) (*quoting Russell v. United States,* 369 U.S. 749, 765, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)). *See also United States v. Salisbury,* 983 F.2d 1369, 1375 (6th Cir.1993).

▆▆▆▆ This specificity requirement serves several purposes required by the Constitution and identified by the Supreme Court over a century ago. First, there is the "fair notice requirement that the indictment must furnish the defendant with" "such a description of the charge" against her so that she is able to "make [her] defense." *United States v. Cruikshank,* 92 U.S. 542, 558, 23 L.Ed. 588 (1875). Second, the indictment must allege the conduct being charged with sufficient particularity that the defendant can raise her conviction or acquittal as a bar to future proceedings based on the same conduct. *Hamling v. United States,* 418 U.S. at 117, 94 S.Ct. 2887. Finally, the indictment must be sufficiently detailed to "inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had.

For this, facts are to be stated, not conclusions of law alone." *United States v. Cruikshank,* 92 U.S. at 558.

▆▆▆▆ In this case, it is not clear how the alleged conduct satisfies any of the essential elements of the two statutes that are invoked. The elements are so hopelessly entangled that it is impossible for either the Court or Ms. Hsia to determine precisely what conduct on her part has subjected her to prosecution on these charges. *See United States v. Salisbury,* 983 F.2d at 1375 (dismissing indictment because it "fails to adequately notify the defendant of the specific occurrences which constituted the charges against her"). For instance, because it is not at all clear from the indictment *whether* or *how* the statements are false, it is difficult to determine whether Ms. Hsia "caused" the false statements to be made by taking actions to mislead someone else into making affirmatively "false" statements or whether she "caused" the false statements by taking some action that was independent of the making of the statement and that made the statements false. Similarly, because the indictment does not clearly articulate what "act" by Ms. Hsia "caused" the false statements, it is difficult, if not impossible, to determine whether Ms. Hsia could have taken that act with the requisite knowledge to meet the "willful" intent element. Because the facts and circumstances alleged in the indictment appear to be only tangentially related to the offenses charged, the Court would have to read Sections 1001 and 2(b) very broadly indeed in order to find that the indictment serves the purposes constitutionally required of an indictment and that it adequately alleges violations of those statutes.

The problem is exacerbated by the fact that the indictment in this case charges conduct in an area that is permeated by First Amendment considerations, and overly broad or vague applications of the statutes invoked therefore are constitutionally impermissible. Because limitations on campaign contributions "operate in an area of the most fundamental First Amendment activities," *Buckley v. Valeo,* 424 U.S. at 14, 96 S.Ct. 612, any

regulation of campaign contributions is subject to close scrutiny to ensure that the government's interest in regulating that activity outweighs any burden on the First Amendment and to ensure that the legislation is carefully tailored and "closely drawn" to protect the First Amendment rights at issue. *Id.* at 25, 96 S.Ct. 612.[23] All the more so when criminal sanctions are involved and when a prosecutor goes outside the carefully structured regulatory scheme provided by Congress in devising a theory of prosecution.

The combination of the First Amendment interests at stake and the threat of a criminal prosecution necessitates a close examination of any indictment to ensure that the statutes utilized are neither overly vague nor overly broad in their language or in their application. *See Buckley v. Valeo*, 424 U.S. at 40–41, 96 S.Ct. 612 (close examination required where legislation imposes criminal penalties "in an area permeated by First Amendment interests"); *id.* at 76–77, 96 S.Ct. 612 (in analyzing independent expenditure disclosure provision, Court conducts First Amendment vagueness analysis, noting that "the provision raises serious problems of vagueness, particularly treacherous where, as here, the violation of its terms carries criminal penalties and fear of incurring these sanctions may deter those who seek to exercise protected First Amendment rights"); *see also Grayned v. Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (even a "clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits consti-

tutionally protected conduct"). The due process doctrines of vagueness and overbreadth together guard against "the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of the sanctions." *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).[24]

The doctrine of vagueness incorporates notions of fair notice and fair warning. *Smith v. Goguen*, 415 U.S. 566, 572, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). At its most fundamental, it operates to ensure that "no [woman] shall be held criminally responsible for conduct which [she] could not reasonably understand to be proscribed," *Buckley v. Valeo*, 424 U.S. at 77, 96 S.Ct. 612 (quoting *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954)), and "due process bars courts from applying a novel [or strained] construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997). Where a statute reaches expression protected by the First Amendment, "the doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. at 573, 94 S.Ct. 1242.[25]

---

**23.** Admittedly, there is some disagreement among the circuits concerning the precise level of protection afforded to campaign contributions. *Compare Akins v. Federal Election Commission*, 101 F.3d 731, 741 (D.C.Cir.1996) (*en banc*), *vacated on other grounds*, —— U.S. ——, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (campaign contributions entitled to less First Amendment protection than campaign *expenditures*, and regulation of campaign contributions therefore merits less exacting scrutiny than regulation of campaign expenditures) *with Russell v. Burris*, 146 F.3d 563, 567 (8th Cir.1998) ("Government attempts to limit campaign contributions ... are subject to the closest scrutiny ... a significant interference with protected rights of political association may be sustained only when the state demonstrates a compelling interest and means closely drawn to avoid unnecessary abridgement of asso-

ciational freedom") (internal citations and quotations omitted).

**24.** While the Court in *Buckley* ultimately upheld the *facial* constitutionality of the carefully tailored contribution limits and disclosure provisions of FECA, it did so only after conducting a thorough analysis of those provisions to ensure that they did not unduly infringe on the First Amendment rights at issue. It would be peculiar indeed if the *application* of criminal statutes that are much broader than FECA to the same type of conduct at issue in *Buckley* were not subject to at least the same level of scrutiny to ensure that First Amendment interests were not being unduly burdened.

**25.** The "fair notice" protections of the vagueness doctrine are substantively different from the "fair notice" requirements for the sufficiency of an

The overbreadth doctrine is aimed at laws that are drafted so broadly that they sweep within their scope both expression that is protected by the First Amendment and unprotected expression or conduct. The doctrine is "predicated on the sensitive nature of protected expression: 'persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression.'" *New York v. Ferber*, 458 U.S. 747, 768, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (*quoting Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980)). Because the vice of an overly broad statute is the risk that it will encompass both protected and unprotected expression or conduct, the Supreme Court has entertained attacks on such statutes "even though the conduct of the person making the attack is clearly unprotected and could be proscribed by a law drawn with the requisite specificity." *New York v. Ferber*, 458 U.S. at 769, 102 S.Ct. 3348.[26]

There is no doubt that the conduct charged here could constitutionally be "proscribed by a [criminal] law drawn with the requisite specificity," *New York v. Ferber*, 458 U.S. at 769, 102 S.Ct. 3348, and that the conduct in fact has been proscribed, at least in part, by Congress in FECA. *See* 2 U.S.C. § 441f. ("No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution. . . ."). Nor is there any doubt that Congress could conclude that felony rather than misdemeanor penalties are appropriate for the conduct it proscribes. *See supra* at 41 n. 9. The issue in this case is whether charging the conduct described in the indictment under Sections 1001 and 2(b) would require a constitutionally overbroad or vague application of those statutes to this conduct.

The facial constitutionality of Sections 1001 and 2(b) is not at issue. They have been applied in a myriad of contexts and to a wide variety of conduct since the turn of the century, even in some cases where the First Amendment arguably was implicated. *See, e.g., United States v. Rodgers*, 466 U.S. 475, 484, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984) (Section 1001 constitutional as applied to defendant who made false report to FBI and Secret Service); *United States v. Daly*, 756

---

indictment discussed *supra* at 55. The fair notice requirement of the vagueness doctrine protects people from the application of *statutes* that are so vague that a reasonable person has no notice that her conduct might be proscribed by that statute. It is based on the Due Process Clause of the Fifth Amendment. *See* Note, *The Void for Vagueness Doctrine in the Supreme Court*, 109 U.Pa.L.Rev. 67 (1960). The requirement that an *indictment* must provide fair notice, by contrast, protects a defendant's right to an indictment that is detailed enough so that she can prepare a defense and be protected against double jeopardy. It is based on the Fifth Amendment grand jury indictment requirement, the Fifth Amendment's Double Jeopardy Clause and the Sixth Amendment's right to be informed of the nature and cause of the accusation. *See Russell v. United States*, 369 U.S. at 770–71, 82 S.Ct. 1038; *United States v. Cruikshank*, 92 U.S. at 557–58.

**26.** "[T]he doctrines of vagueness and overbreadth are not entirely distinct, and . . . the vices of vagueness and overbreadth are not wholly separable, in the area of the first amendment." Note, *The First Amendment Overbreadth Doctrine*, 83 Harv.L.Rev. 844, 873 (1970). The twin vices addressed by the doctrines of vagueness and overbreadth are the lack of fair warning and

notice that someone's conduct may be subject to the criminal sanction and, because First Amendment protections are implicated, the threat that the overbroad language or application of a statute may chill protected speech by coercing people to leave protected utterances unspoken even when they are protected by the Constitution. Note, *The Void for Vagueness Doctrine in the Supreme Court*, 109 U.Pa.L.Rev. at 76. The due process vices of facially vague statutes—lack of fair warning and lack of adequate standards or guidance—are the same vices that have led the Supreme Court to define the permissible reach of an overbroad statute more narrowly rather than to strike it down entirely. Note, *The First Amendment Overbreadth Doctrine*, 83 Harv. L.Rev. at 872–75. *See Boos v. Barry*, 485 U.S. 312, 330, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *New York v. Ferber*, 458 U.S. at 773, 102 S.Ct. 3348; *Buckley v. Valeo*, 424 U.S. at 76–77, 96 S.Ct. 612; *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). *Cf. United States v. Nofziger*, 878 F.2d 442, 453–54 (D.C.Cir.) (court of appeals reverses conviction by invoking third related doctrine, rule of lenity, to impose *mens rea* requirement on ambiguous statute in First Amendment area where statute itself did not clearly provide *mens rea* ), *cert. denied*, 493 U.S. 1003, 110 S.Ct. 564, 107 L.Ed.2d 559 (1989).

F.2d 1076, 1081–82 (5th Cir.) (Sections 1001 and 2 constitutional as applied to scheme setting up churches to avoid income tax because jury considered only whether religious beliefs were truly held, not truth or falsity of beliefs), *cert. denied* 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 558 (1985). In this case, however, it requires an extraordinarily deft and clever reading of the false statements statute and Section 2(b) to discern the basic elements of the offense as applied to the conduct alleged: (1) a false statement, (2) a causal link between Ms. Hsia and the false statement, and (3) the requisite knowledge and intent. In the face of an indictment that so obscurely charges violations of Sections 1001 and 2(b), the due process doctrines of overbreadth and vagueness prevent this Court from stretching Sections 1001 and 2(b) so far beyond their generally accepted scope to reach the conduct alleged.

█ For starters, it is a battle to find the false statements in the indictment. A false statement is an essential element of a prosecution under 18 U.S.C. § 1001, and if the statement at issue is literally true a defendant cannot be convicted of violating Section 1001. *See Bronston v. United States,* 409 U.S. 352, 357–58, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) (unresponsive statement, even if intended to deceive, insufficient to sustain conviction of perjury); *United States v. Milton,* 8 F.3d 39, 45 (D.C.Cir.1993), *cert. denied,* 513 U.S. 919, 115 S.Ct. 299, 130 L.Ed.2d 212 (1994) ("Falsity is an essential element of the section 1001 offense").[27] The indictment in this case alleges that the "false statements" are the names of people who were "falsely identified" as contributors in the political committees' reports to the FEC. Ms. Hsia argues that the reports filed by the political committees make no factual assertions that the persons listed are the "true" or "actual" sources of the receipts, and she is quite right that the reports and the attached schedules do not expressly assert that the names listed are the "true sources" of the contributions.

The government contends, however, that those reports, when read in conjunction with the accompanying regulations and statutory provisions, imply an assertion that the listed names are the "true sources" of the contributions. This argument would make sense if a political committee treasurer or some other sophisticated committee official who actually made the "statement" to the FEC, knowing it was false and with the intent to deceive, had been indicted, either alone or as a co-conspirator with someone like Ms. Hsia. It is a stretch, however, to apply that reasoning here.

FECA requires political committees to exert best efforts to identify each person who makes a contribution to the political committee during the particular reporting period and whose aggregated contributions in that calendar year exceed $200 and to report that identification to the FEC. 2 U.S.C. §§ 432(i), 434(b)(3)(A). FEC regulations require "reporting committees" to exert "best efforts" to obtain the "identification" of each individual who contributes an amount in excess of $200 to the committee's federal ("hard money") account and to report that information. 11 C.F.R. § 104.8(a). The regulations specify that the "identification" shall include the individual's name, mailing address, occupation, the name of his or her employer, if any, and the date of receipt and amount of any such contribution. *Id.* In addition, the regulations provide that "[a]bsent evidence to the contrary, any contribution made by check, money order, or other written instrument shall be reported as a contribution that has been made by the last person signing the instru-

---

27. It is not entirely clear whether the literal truth of a statement is grounds for dismissal of an indictment or whether it operates only as a defense at trial. *See, e.g., United States v. Milton,* 8 F.3d at 45; *United States v. Dale,* 991 F.2d 819, 832–33 (D.C.Cir.), *cert. denied,* 510 U.S. 906, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993). At least two courts, including this one, however, have suggested that literal truth is grounds for dismissal of the indictment. *See United States v. Vesaas,* 586 F.2d 101, 104 (8th Cir.1978) ("the indictment is fatally defective in failing to set forth an offense under § 1001" when the statement is facially true); *United States v. Clarridge,* 811 F.Supp. 697, 712 (D.D.C.1992) (Greene, J.) ("*Bronston* requires the court to dismiss the indictment only when it is plain that the government cannot prove that the defendant's statement was false").

ment prior to delivery to the candidate or committee." 11 C.F.R. § 104.8(c).

The itemization of the political committee's receipts generally is attached as a schedule to the summary report to the FEC of disbursements and receipts for the reporting period. The FEC has a specific form, Schedule A, on which the political committees are supposed to itemize receipts. Schedule A includes a line for the name of the committee, and then has boxes for listing various categories of information, including "Full Name, Mailing Address and ZIP Code," "Name of Employer," and "Amount of Each Receipt this Period." The itemization of receipts that contain the alleged false statements in this case appear to be simply computer print-outs with columns of names and addresses, employers/occupations, dates, amounts and, in some cases, year to date aggregate amounts. *See* Def's Motion No. 6, Exh. A–E.

While political committees must exert best efforts to identify individual contributors from whom they receive contributions, the contributors themselves have no duty to disclose any identifying information to the political committees, including even their name. *Republican Nat'l Comm. v. Federal Election Comm'n*, 76 F.3d 400, 406 (D.C.Cir.1996) (contributor has no duty to reveal identity to FEC or political committees), *cert. denied*, —— U.S. ——, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997). The statute and the regulations therefore place *no disclosure obligation* on contributors and contain a "safe harbor" provision for political committees: If the political committee exerts its "best efforts" to obtain the relevant identifying information, including mailing a one-time request for such information to the contributor, *id.* at 403, 406, the report of the committee "shall be considered in compliance with" FECA. 2 U.S.C. § 432(i); 11 C.F.R. § 104.7. Thus, if the contributor does not respond to the committee's request, as is her right, the committee will have no information other than the check. It then may report the last name on the check to the FEC as the presumptive "contributor," and the committee is deemed

to have met its obligations. *See* 11 C.F.R. §§ 104.7, 104.8(c).

Ms. Hsia argues that because the FEC's Schedule A never specifies that the political committee must list the name of the "true" or "actual" source of the contribution, the political committee's failure to list the "true" source of the contribution cannot constitute a "false statement." Ms. Hsia is correct that *the political committees' reports and the attached schedules do not expressly assert that the names listed on it are the "true sources"* of the contributions. Furthermore, although the definition of the word "contribution" in FECA occupies pages of the United States Code, the statute itself never explicitly defines contribution with reference to the "true source" of the funds. *See* 2 U.S.C. § 431(8).[28] The government therefore is left to argue that a factual assertion that the name listed on the form is the true source of the contribution can be implied from FECA and the accompanying regulations.

There is at least a plausible argument that knowledgeable and sophisticated political committees or committee treasurers impliedly assert when they submit reports to the FEC that to the best of their knowledge the names listed on the reports are the "true sources" of the contributions. First, the regulation stating that "[a]bsent evidence to the contrary, any contribution made by check, money order, or other written instrument shall be reported as a contribution by the last person signing the instrument prior to delivery to the candidate or committee," 11 C.F.R. § 104.8(c), implies that *if there is* "evidence to the contrary" of which the political committee is aware, the committee may *not* report the contribution as having been made by the last person signing the instrument. The FEC regulation, if not the statute itself, therefore implies that the term "contributor" is not synonymous with the phrase "the last person signing the instrument" and that the political committee is supposed to identify the "true source" of a contribution if it knows the true source.

Second, FECA provides that "[n]o person shall make a contribution in the name of

28. Neither FECA nor FEC regulations define the word "contributor." At oral argument, the government stated that a contributor is "a person who makes a contribution." Transcript at 121.

another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person." 2 U.S.C. § 441f. Because the term "contribution" is used in this section of FECA in conjunction with the person who is the actual source of the funds, rather than with the "name of another person," and because the same statutory definition of "contribution" applies in every section of FECA that uses the term (with one exception not relevant here), there is an implication that the term "contributor" means the true source, rather than the person whose name has been used.[29]

The provisions of FECA and the regulations on which the Court must rely to find false statements set forth the requirements for the filing of committee reports with the FEC in terms of the obligations and knowledge of the political committee treasurer, not someone like Ms. Hsia. When the treasurer signs his or her name to such a report, it is a relatively simple matter to determine the implied assertions that are being made. If the treasurer lists a name on the committee report that comes from the payor line on a check, he or she asserts that "best efforts" have been made to obtain complete identifying information—in other words, that the treasurer has *asked for* identifying information—and that the treasurer has no evidence that the listed name is not the actual contributor. Therefore if the treasurer knowingly lists a conduit as the true contributor, he or she could properly be indicted for making a false statement under 18 U.S.C. § 1001. Similarly, if Ms. Hsia or a conduit contributor had knowingly conspired with the treasurer to have the treasurer intentionally misidentify the true contributor in a report to the FEC, there might be a legitimate charge of making a false statement or, more probably, of conspiracy to violate the false statements statute.[30]

The indictment here, however, does not allege that Ms. Hsia conspired with political committee treasurers to conceal from the FEC the identities of actual contributors and, absent any allegation of wrongful knowledge on the part of the political committees referred in the indictment, it is difficult to ascertain what, if any, implied assertions the

---

**29.** In addition, for purposes of determining whether a person has exceeded dollar limitations on contributions, FECA specifically provides that "all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate. The intermediary or conduit shall report the original source and the intended recipient of such contribution to the Commission and to the intended recipient." 2 U.S.C. § 441a(a)(8); *see* 11 C.F.R. § 110.6(a). This provision, however, was intended to address *legal* "conduit" contributions—for instance when an individual contributes money to a national party that is earmarked for the campaign of a certain candidate—and both the government and Ms. Hsia believe that the provision is wholly irrelevant in this case. See Transcript at 116–17, 125.

**30.** If Ms. Hsia or one of her co-conspirators had responded to the request from a political committee for additional information and had affirmatively stated that the conduit was the true contributor, they probably could be charged with a violation of 18 U.S.C. § 1001 and 18 U.S.C. § 2(b), but under a slightly different theory. In that case, the response sent by Ms. Hsia or her co-conspirator would be an affirmative statement that the political committee essentially would directly relay to the FEC in its report. Assuming that Ms. Hsia knew that the political committee would relay her false statement to the FEC and that the other requirements for prosecution under Sections 1001 and 2(b) in the federal election context had been met, such a prosecution would be permissible. *Cf. United States v. Hopkins,* 916 F.2d at 214–15 (conviction under Sections 1001 and 2(b) upheld where defendant formed political action committee and directly submitted false information to committee treasurer for inclusion in committee report to FEC); *United States v. Oakar,* 924 F.Supp. at 242–43 (defendant, a former Congresswoman, properly charged with violating Sections 1001 and 2(b) where she made misrepresentations to campaign treasurer that resulted in falsities on financial disclosure reports).

In this case, however, Ms. Hsia and her co-conspirators remained silent and did not respond, as was their right. *Republican Nat'l Comm. v. Federal Election Comm'n,* 76 F.3d at 406. The only thing the conduits did was to sign blank checks in their own names at Ms. Hsia's request, and the government does not and cannot allege that the checks themselves contained false statements. *See Williams v. United States,* 458 U.S. 279, 284, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982).

political committees made in their reports and whether any of those assertions were "false." In this area of First Amendment protections, the very fact that it is necessary to draw so many inferences and assume such detailed knowledge of arcane regulations in order to find that the reports contain false statements counsels against concluding that Section 1001 reaches such "statements."

The next hurdle for the government to overcome in the due process analysis relates to the "causation" requirement of 18 U.S.C. § 2(b). Ms. Hsia argues that the indictment does not allege *any* conduct on her part that could have "caused" the political committees to file false statements, but alleges only that she "knew" that the "individuals named in the report[s] were not the actual contributors." *See, e.g.*, Indictment at ¶ 43. She further maintains that her *knowledge* that the reports contained false statements is insufficient to establish that she "caused" the false statements to be made. Ms. Hsia is correct, of course, that in order for the government to prove that she "caused" a false statement to be made, it must prove more than mere knowledge of falsity. It must also prove that she took some affirmative action—engaged in some conduct—that led the political committees to file statements with the FEC that were false, and that she acted knowingly and willfully. If the indictment alleged only that Ms. Hsia "knew, in truth and in fact, that the individuals named in the report were not the actual contributors," *see, e.g.*, Indictment at ¶ 43, Ms. Hsia certainly would be entitled to dismissal of the false statements counts.

The indictment does slightly more than Ms. Hsia suggests, however. It tracks the language of the statute and alleges that Ms. Hsia "caused the submission of a material false statement to the FEC." *See, e.g.*, Indictment at ¶ 43. In most cases, it would be

sufficient to withstand a motion to dismiss an indictment simply to invoke the statutory word connoting the act or conduct engaged in—in this case "cause[d]—along with the mental element required by the statute, 'willfully.'" *See Hamling v. United States*, 418 U.S. at 117, 94 S.Ct. 2887. But where the facts alleged do not clearly constitute the conduct charged, the indictment has not served its purpose of fairly informing the accused of the offense with which she has been charged. *See id.; United States v. Salisbury*, 983 F.2d at 1375 (indictment alleging violation of multiple voting statute must be dismissed where none of facts alleged in indictment clearly constituted multiple voting as commonly understood). Furthermore, in the First Amendment area, due process requires the Court to consider whether the statutes invoked have been impermissibly stretched and too broadly applied. In this case, the First Amendment concerns of *Buckley* and the overbreadth and vagueness doctrines present insurmountable constitutional impediments to this combined Sections 2(b)/1001 prosecution for causing false statements.

At oral argument, the government proffered that it intends to prove that Ms. Hsia "caused" the political committees to make false statements by soliciting conduit contributions (or, in certain cases, that "she solicited through others") and "in certain instances that she took steps to forward the conduit checks to the respective committees." Transcript at 138–39. According to the government's proffer, Ms. Hsia took the affirmative steps of soliciting conduit contributions and putting conduit checks in the mail or handing them to a representative of the political committee, and she thereby "put into motion a series of events which ultimately led to the false statements being submitted to the FEC." *Id.* at 138.[31]

---

31. The government's strongest case is set forth in the bill of particulars. Even that "best case" presents only a very weak argument that Ms. Hsia engaged in any willful conduct that caused the political committees to make false statements to the FEC: Ms. Hsia allegedly solicited and collected money from various individuals and provided the money she solicited to other individuals ("straw" or "conduit" donors) who signed checks in particular amounts, leaving the payee line blank; Ms. Hsia or someone else at her direction then wrote in the name of the political committee and forwarded the checks to the committee. Bill of Particulars at 14–15. The bill of particulars adds the fillip that she did so "knowing that the committee would report the contributions to the FEC as having been made by the conduits," *id.*, a statement that relates only to her knowledge and adds nothing to the *conduct* the government intends to prove at trial.

The problems with the government's theory abound. First, the checks themselves do not make any assertions as to whether the person who signed the check was the true source of the contribution, and since a check is not an affirmative statement of anything, it cannot make any affirmative misrepresentations. *Williams v. United States*, 458 U.S. 279, 284, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) (signature on check implies only factual assertion that drawer will make good on obligation if bank refuses to honor check; signature is not factual assertion at all and does not even imply that sufficient funds are in account to cover check); *United States v. Elliott*, 689 F.2d 178, 180–81 (10th Cir.1982) (same; conviction reversed and remanded with instructions to dismiss indictment). Furthermore, since a contributor has no obligation to disclose any identifying information to the political committee or to the FEC and may simply not respond when the political committee meets its minimal statutory obligation of asking for such information, *Republican Nat'l Comm. v. Federal Election Comm'n*, 76 F.3d at 406, the signature on the check is not an indication of anything more than that the signatory signed the check; it says nothing about whose money is being conveyed by the check that is presented. *Cf. Bronston v. United States*, 409 U.S. 352, 357–58, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) (unresponsive statement, even if intended to deceive, insufficient to sustain conviction of per-

jury). Absent some additional affirmative conduct, Ms. Hsia's solicitation and delivery or mailing of checks could not have "caused" the political committees to make false statements.[32]

While the government may have an argument that Ms. Hsia's actions were a "but for" cause of the alleged false statements, there comes a point when the causal links are so attenuated that a "but for" causal connection is not enough under the Due Process Clause to hold someone criminally responsible for a particular outcome. In a case with no First Amendment implications, perhaps the meaning of Section 2(b) causation could be stretched to cover the kind of conduct alleged as the government proposes. Given the pervasive First Amendment ramifications at stake here, however, Section 2(b) cannot be so distorted.[33]

All of this is not to say that the government may not criminally prosecute the conduct alleged in the indictment under a narrowly drawn statute. But when general criminal statutes are used in an attempt to impose criminal liability in an area that is both First Amendment-sensitive and highly technical and complex, the Court must guard against the risk that legitimate and protected speech will be chilled, that a prosecutorial net, thrown broadly, will ensnare the innocent for unknowing or technical violations and will engender fear among those seeking to engage in legitimate protected First Amendment activity. *See Buckley v. Valeo,*

---

**32.** The knowing and willful intent requirement presents an additional obstacle for the government in this case. This Court previously has held that the prosecution must prove that Ms. Hsia "knew of the [political party] treasurers' reporting obligation, that [she] attempted to frustrate those obligations, and that [she] knew [her] conduct was unlawful." Opinion of August 13, 1998 at 5 (internal citations and quotations omitted). It is difficult, if not impossible, in the context of this indictment to imagine how the government possibly could prove that Ms. Hsia knew, at the time that she took whatever acts exposed her to Sections 1001 and 2(b) liability, that under the complex reporting scheme imposed on political committees, the listing of a name from a check might be deemed a "false statement" and that her solicitations might "cause" the political committees to make those false statements.

**33.** Count 6 of the Indictment is the only count that alleges that Ms. Hsia herself acted as a conduit contributor and that she signed and submitted a check to the political committee. This allegation, not present in Counts 2–5, strengthens the government's argument that there is a causal connection between Ms. Hsia and the political committee with respect to the conduct alleged in this count. The Court nonetheless concludes that it would still require a significant broadening of Section 2(b) to cover this conduct because the check that Ms. Hsia signed still makes no affirmative statement that she is the true contributor. Moreover, the fact that Ms. Hsia is one step closer to the statement made by the political committee does not alter the fact that it is nearly impossible to find that the reports imply any "false" assertions.

424 U.S. at 76–77, 96 S.Ct. 612; *Cantwell v. Connecticut*, 310 U.S. at 308, 60 S.Ct. 900.[34]

The Court is not unmindful that even in areas of First Amendment concern, the expansive constitutional guarantees of fair notice, required both of the indictment and of the criminal statute at issue, and the constitutional protection against overly broad constructions of statutes are neither often nor lightly used by the courts to dismiss an indictment or reverse a conviction. Often these doctrines provide "little more than atmospherics," and the courts "do not tolerate judicial rewriting of otherwise validly enacted criminal statutes." *See United States v. Nofziger*, 878 F.2d at 456 (Edwards, J. dissenting). These doctrines gain true significance and substance, however, in those rare cases when an indictment so distorts a criminal statute that the words of the statute lose all meaning. It simply is not true that when the government uses a word, that word means what the government chooses it to mean. When faced with such an indictment, a court has the obligation to restore some boundaries to the words of the statute.

The remoteness of Ms. Hsia's position in relation to the FEC, the case law with respect to "literal truth," the fact that a check is not a statement, and the willful intent hurdle discussed in a previous opinion in this case together make it impossible to conclude that Sections 1001 and 2(b) can be applied consistently with the Constitution to the conduct alleged here. Any finding that Sections 1001 and 2(b) proscribe the conduct alleged in Counts 2–6 would require an unconstitutionally overly broad and vague reading and application of those statutes. The Court therefore concludes that they do not reach the conduct alleged in this indictment and that Counts 2–6 must be dismissed. The Constitution requires no less.

An Order consistent with this Opinion will be issued this same day.

**SO ORDERED.**

---

**34.** The first count of the indictment, which charges conspiracy to defraud the FEC and the INS, is an example of a legitimate use of a provision of the general Federal Criminal Code to charge a violation in a First Amendment-sensitive area. The indictment clearly alleges a conspiratorial agreement, and it clearly alleges that the objects of the agreement were to obstruct specific functions of the FEC and the INS. *See supra* at 52–53. Thus, while the conduct charged in the indictment touches on areas of First Amendment sensitivity, the Court finds that the straightforward application of Section 371 to this conduct does not require an unconstitutionally overbroad construction of the statute.

*ORDER*

For the reasons stated in the Opinion issued this same day, it is hereby

ORDERED that Counts 2–6 of the indictment are DISMISSED; it is

FURTHER ORDERED that defendant's Motion No. 2 (to Dismiss Counts in the Indictment for Their Positive Repugnance to the Federal Election Campaign Act) is DENIED; it is

FURTHER ORDERED that defendant's Motion No. 3 (to Dismiss Count 1 of the Indictment for Failure to State an Offense) is DENIED; it is

FURTHER ORDERED that defendant's Motion No. 9 (to Dismiss Indictment Because it Offends the First Amendment) is DENIED; and it is

FURTHER ORDERED that defendant's Motion No. 10 (to Dismiss Indictment Because It Selectively Prosecutes Maria Hsia) is DENIED.

SO ORDERED.